FILED
U.S. DISTRICT COURT
INDIANAPOLIS DIVISION
11 MAY 11 PM 4:34
SOUTHERN DISTRICT
OF INDIANA
LAURA A. BRIGGS
CLERK

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| MT. VERNON SCHOOL CORP. and HANCOCK MADISON SHELBY EDUCATIONAL SERVICES, | )<br>)<br>)<br>) |
| Plaintiffs, | )<br>) |
| v. | ) Case No. _____<br>) |
| A.M., by his Parents and Next Friends, RICH and PAM MAIER, | )<br>) **1 : 11 -cv- 0637 TWP -TAB**<br>) |
| Defendants. | ) |

## COMPLAINT AND PETITION FOR REVIEW

Come now Plaintiffs, Mt. Vernon School Corporation and Hancock Madison Shelby Educational Services (jointly hereinafter "School"), by counsel, and file their Complaint and Petition for Review.

### JURISDICTION AND VENUE

1. This action is brought pursuant to the provisions of the Individuals With Disabilities In Education Act (hereinafter "IDEA"), 20 U.S.C. 1400 *et seq.*, the pertinent implementing regulations promulgated under the Code of Federal Regulations, and Article 7 of the Indiana Administrative Code (hereinafter Article 7), 511 IAC 7 *et seq.*, and including all of the rights, entitlements, and procedural safeguards mandated by these laws.

2. This Court has jurisdiction of this cause pursuant to 20 U.S.C. § 1415; 28 U.S.C. §1331 and 28 U.S.C. § 1367.

3. This action is brought pursuant to 20 U.S.C. § 1415(i)(2)(A) in order to seek review of the administrative proceedings, and the decisions and orders issued by the Independent Hearing Officer (hereinafter "IHO"), in Article 7 Hearing No. HR-034-2011.

4. This Court has jurisdiction for said review pursuant to Section 1415 of IDEA (20 U.S.C. § 1415(i)(2)(A), a federal statute, and 28 U.S.C. § 1331, which grants "original jurisdiction" to the district court for "all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. Further, this Court has "supplemental jurisdiction" over any claims arising under Indiana state law pursuant to 28 U.S.C. § 1367.

5. This Court is the proper venue for this cause of action because all Defendants reside in Hancock County, Indiana; and all relevant events took place in Hancock County, Indiana. Hancock County falls within the Indianapolis Division of this Court. The proper venue is the United States District Court for the Southern District of Indiana.

6. Pursuant to Article 7, there was an administrative due process hearing held on March 21, 23, 24 and 25, 2011. The decision of the IHO was issued on April 15, 2011, and received by counsel for the Plaintiffs on April 18, 2011. Indiana's Article 7 states that: "Any party disagreeing with the decision of the independent hearing officer may file a petitioner for judicial review …[Said appeal] must be filed within thirty (30) calendar days after the date of the independent hearing officer's written decision is received by the party." 511 IAC 7-45-9(a). Thus, Plaintiffs must file this Complaint by May 18, 2011, in order for it to be timely filed.

7. Additionally, this section of Article 7 says: "The Court shall: (1) receive the record of administrative proceedings, (2) hear additional evidence at the request of a party, and (3) grant the relief it determines to be appropriate, basing its decision on a preponderance of the evidence." 511 IAC 7-45-9(a)(1-3).

## PARTIES

8. The School Corporation's principal offices for Mt. Vernon School Corporation are at One Shoppell Blvd., Fortville, Indiana, and Hancock Shelby Madison Educational Services at 1834 Fields Blvd., Greenfield, Indiana in Hancock County, Indiana. The School is a Local Education Agency ("LEA") which receives federal funds under IDEA, and is obligated to fulfill the requirements of the IDEA and Article 7. Under these statutes, the School must provide a free and appropriate public education (hereinafter "FAPE") to A.M. within A.M.'s least restrictive environment (hereinafter "LRE") which is reasonably calculated to provide educational benefit.

9. At all times relevant herein, Defendants, A.M., a minor child, by his Parents and Next Friends, Rich and Pam Maier, resided in McCordsville, IN 46055.

## GENERAL ALLEGATIONS

10. A.M. is seventeen years old, and a student living in the boundaries of Mt. Vernon School Corporation. He has been identified as qualifying for special education services with a primary disability of Autism Spectrum Disorder. A.M. attended a program through Hancock Shelby Madison Educational Services, the special education cooperative for Mt. Vernon, located at Pendleton Heights High School.

11. Under the IDEA and Article 7, the School has designed a program to assist A.M. with a program tailored to meet his educational needs in the school setting. The School is not required to generalize skills to A.M.'s home. See Thompson R2-J Sch. Dist. v. Luke P., 540 F.3d 1143 (10th Cir. 2008) and Devine v. Indian River County Sch. Bd., 249 F.3d 1289 (11th Cir. 2001).

12. The IDEA requires that the "removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of the child is

such that education in regular classes with the use of supplemental aids and services cannot be achieved satisfactorily." 20 U.S.C. 1412 (a) (5) (A). See also 34 C.F.R. § 300.550.

13. A family challenging the school's program must establish two essential elements: (1) That the public school offering was not a FAPE; **AND,** (2) that the private school where the parent unilaterally placed the student is appropriate. See <u>Todd v. Duneland Sch. Corp.</u>, 299 F. 3d 899 (7th Cir. 2002).

14. In order to develop a program, the family is required by the IDEA to participate in the interactive process and share their concerns during a case conference meeting. See <u>Hjortness v Neenah Joint School District</u>, 507 F.3d 1060 (7th Cir. 2007).

## A.M.'S SCHOOL PROGRAM AND PLACEMENT

15. Prior to spring 2010, A.M. had previously been placed in a residential facility called Damar due to behaviors and the Case Conference Committee (CCC) continued to discuss and analyze moving A.M. to a less restrictive environment when the targeted behaviors decreased. By September 29, 2009, the Defendants still wanted to have A.M. placed at Damar but in their email to the School, the Defendants note that A.M. has made "tremendous strides."

16. A February 22, 2010 IEP report resulted in a decision by both parties that a "gradual fading of the dependency of a single 1:1 for [A.M.] and transition to his home school program in the beginning of the 2010-2011 school year" was appropriate.

17. As part of this plan, A.M. was to remain at Damar over the summer 2010. It was anticipated that he would begin the transitioning to his home school district at the beginning of the 2010-2011 school year. Defendants participated in the design of this plan, thought it was a good plan and agreed with it.

4

18. On April 17, 2010, the Defendants sent an email to the School indicating that they were diverting from the February 2010 IEP report. Defendants knew that a case conference is where the parties meet to plan for educational needs of a student but they wanted A.M. to begin commuting to Damar and when "regular school ends" at Damar they wanted him at home with them over summer 2010. By taking this action, the family acknowledged that they were not sure how this would impact the process they discussed that would begin in June.

19. On May 13, 2010, the Defendants indicated that A.M.'s behaviors at home had been level and that his speech was improved. Additionally, A.M.'s behaviors were good when he was out in public. Later that same day (May 13, 2010), the Defendants wrote again and said that they "did not have a negative view of Damar" and that "[t]his is not about starting a shake up as much as it is about parents resuming the full time care of their son. ☺"

20. Because the Defendants decided that they were accepting responsibility for A.M. in their home as his parents, the CCC convened on May 14, 2010 to design a new program for him. Both parties acknowledged that this May 14, 2010 IEP replaced the February 22, 2010 IEP.

21. In the May 14, 2010 CCC, the Defendants noted that although his transition plan was originally not to begin until the beginning of the 2010-2011 school year, they decided to begin the transition in his home. The Defendants indicated that A.M. was doing well in their home.

22. Although the regular school calendar began on August 17, 2010, the May 13, 2010 CCC discussed there were lots of activity at the beginning of the year and that this would not be good for A.M. Therefore, the parties agreed he would begin later than August 17, 2010; along with his assistant from Damar accompanying him. As an extended school year offering for summer 2010, the School provided an autism consultant, and an Assistive Technology

Coordinator to provide services. Additionally, A.M.'s special education teacher was going to provide homebound services until she was informed by Defendants that her services were not needed.

23. In the August 23, 2010 CCC, the Defendants agreed to a program at the local high school for A.M. to include the following: a) a room with higher functioning students for a portion of his day; b) that he should be pulled out of the classroom at times to work with the 1:1 assistant; c) that functional skills could be worked on with in the school setting; d) that they were all brainstorming together; and e) that they would try the plan and "tweak it."

24. Following the August 23, 2010 CCC, A.M. only attended the program for approximately four (4) hours. According to testimony from school employees, this was not enough time to implement the School's program. The Defendants subsequently requested homebound services for A.M.

25. A CCC was held on September 29, 2010, to design the homebound program and Defendants audio-recorded this CCC meeting. The School, by counsel, requested a copy of this audio-recording during the March 24, 2011, due process hearing but the IHO denied this request. The CCC notes show that the parties designed and agreed upon a homebound program for the student.

26. The School subsequently talked on the phone with Defendants who reported that the family did not want to proceed with homebound. On October 24, 2010, the Defendants sent an email saying that they were withdrawing A.M. from Pendleton Heights High School.

27. On November 15, 2010, the Defendants sent an email indicating that the "situation with [A.M.] being home" had become problematic and that a new plan needed developed. The School responded on November 18, 2010 to setup a meeting. There was no

evidence presented by Defendants at the administrative due process hearing on the results or discussions of that meeting. The School attempted to assist the Defendants exploring alternative options for the family as they recognized that the Defendants may need help in their home. The "help" was not a responsibility of the School but they wanted to assist the family.

28. The family wrote on December 13, 2010 requesting an IEP. The parties met on January 4 and 26, 2011, pursuant to the requirement of Article 7 (511 IAC 7-45-5 (a) (7)) to hold a CCC within sixty (60) instructional days of being placed in the homebound program. Arguably, this CCC was no longer even required since the Defendants withdrew on October 24, 2010.

29. During mid-January 2011 the Defendants obtained an evaluation from Little Friends Center for Autism but did not notify the School that they were seeking this evaluation. As a result of the January CCC meetings, the parties developed a program to have A.M. return to school on February 3, 2011. Defendants did not voice disagreement with the proposed program. The CCC notes indicate that Defendants agreed to the program and "suggested that we prepare him to return to school." There was no mention by Defendants of a residential program or placement. The parties testified that they discussed compensatory services and agreed to discuss specifics in mid-February 2011.

30. Defendants "thanked" Hancock Shelby Madison Educational Services Special Education Director Dr. Michael Bennett as they both left the January 26, 2011 meeting. The School witnesses testified that they prepared for A.M. to return but he did not come.

31. Prior to receiving the January 26, 2011 IEP, the Defendants filed for a hearing on January 28, 2011. The IEP was sent to the family on February 8, 2011. During the hearing, the

School, by counsel, asked Defendants "when" they made the decision to file for due process but the IHO denied the School's request to have this question answered.

32. The Defendants failed to participate in the good faith interactive process of the CCC and therefore have created a situation where there was no impasse between the parties prior to this litigation. The School was not allowed the opportunity to engage in a dialogue with the Defendants about the Defendants' proposed placement or to discuss the compensatory services.

33. The hearing was conducted March 21, 23, 24 and 25, 2011, with the IHO rendering her decision on April 15, 2011. The IHO ruled in favor of the Defendants and ordered that the parties "convene the CCC to devise an IEP for Student at Heartspring in cooperation with Heartspring staff." This order did not specify that an IEP, program or placement individualized to A.M. be implemented at Heartspring. In fact, both Heartspring and Counsel for Defendants admitted during the administrative due process hearing that there was no program for A.M. to demonstrate at hearing. The School disputes that the IHO changed "stay-put" as there is no individualized program.

34. At the due process hearing, the Defendants presented zero evidence of a program tailored to meet the individual needs of A.M. The testimony of the only private placement (Heartspring) witness indicated that:

    a) she did not feel comfortable speaking about A.M.'s needs;

    b) that Heartspring had not met A.M. or evaluated him;

    c) that Heartspring did not have an IEP developed for A.M. and

    d) that there was no behavior plan or transition plan developed.

This clearly does not meet Defendants' burden of demonstrating the appropriateness of a program individualized for A.M.

35. The IHO abused her discretion by not allowing the audiotape of the September 2010 case conference and by denying the School's right to ask relevant questions of the Defendants. Furthermore, the IHO's decision was contrary to law, reached in violation of an established procedure and unsupported by substantial evidence.

37. The School appeals the IHO's decision to this Court, requesting a review of the evidence and record presented below.

WHEREFORE, Plaintiffs respectfully request that this Court find by a preponderance of the evidence that record and testimony did not support the findings of fact, conclusions of law, and orders by the IHO and grant all other relief proper in the premises.

Respectfully submitted,

CHURCH, CHURCH, HITTLE & ANTRIM

By: *[signature]*

Andrew A. Manna, #24290-49
CHURCH, CHURCH, HITTLE & ANTRIM
938 Conner Street, P.O. Box 10
Noblesville, IN 46061
Telephone: 317-773-2190
Attorney for Plaintiffs