UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION


MT. VERNON SCHOOL CORP. et al.,            )
                      Plaintiffs,          )
                                           )
          vs.                              )          1:11-cv-637-TWP-TAB
                                           )
A.M. by his Parents and Next of Friends R.M.  )
and P.M.,                                  )
                      Defendants.          )


**REPORT AND RECOMMENDATION ON
MOTIONS FOR SUMMARY JUDGMENT AND SANCTIONS**


I.      **Introduction**

        A.M. is a seventeen-year-old student diagnosed with autism and a speech impairment.

He has significant behavioral issues related to his autism that impact his ability to function in a

normal school environment.  From 2006 to early 2011, A.M.'s parents and the school attempted

to develop individualized plans to address his behavioral issues and educational needs.  A.M.'s

autism, however, proved to be a difficult challenge for his parents and the school, eventually

leading to a breakdown in educational services for A.M.  Consequently, the parents requested a

due process hearing, asserting that Plaintiffs failed to provide A.M. with a free appropriate

public education ("FAPE") as mandated by the Individuals with Disabilities Education Act

("IDEA"), 20 U.S.C. §§ 1400–1491, and the provisions relating to special education in Indiana's

Administrative Code, 511 I.A.C. § 7.

        The parties appeared before an independent hearing officer ("IHO"), who found that

Plaintiffs procedurally and substantively violated IDEA and Indiana law, and agreed to the

residential placement proposed by the parents. [A.R. at 35–39.] For the reasons below, the Magistrate Judge finds that the IHO's findings of fact and conclusions of law are supported by the evidence in the administrative record, and therefore recommends that Plaintiffs' motion for summary judgment [Docket No. 65] be denied and Defendants' motion for summary judgment [Docket No. 62] be granted. The Magistrate Judge also recommends that Defendants' motion for sanctions [Docket No. 76] be denied.

## II.    Background

The facts are undisputed.[1] A.M.'s parents reside within Mount Vernon Community School Corporation's boundaries. [A.R. at 11.] A.M. is a seventeen-year-old student diagnosed with autism. [*Id.*] He has significant behavioral issues related to his autism that include physical aggression, hyperactivity, sexual touching, spitting, picking at his gums until they bleed, sleeping troubles, obsessions, and transitioning from one environment to another. [A.R. at 11, 16–17.] A.M.'s autism is so severe that he was placed in a residential facility, Silvercrest, for two to three years. [Docket No. 11.] Thereafter, he was placed at Damar residential services for more than three years. [*Id.*] A.M. also has a secondary disability due to his language and speech impairment. [*Id.*]

In March 2007, a Case Conference Committee ("CCC") assigned an instructional assistant, Lamar Peterson, to A.M. for one-on-one ("1:1") instruction. [A.R. at 11.] From March 2007 to February 2010, the parents and the school continued to hold CCCs and implement individualized educational programs ("IEPs") that attempted to address A.M.'s educational and

---

[1] The parties' response briefs [Docket Nos. 71, 72] do not designate any potentially determinative facts as disputed as required by Local Rule 56-1(b).

behavioral needs.  [A.R. at 13–16.]  In February 2010, a CCC transitioned A.M. from Damar to a school setting, which included fading A.M. from his 1:1 instruction.  [A.R. at 16–18.]  The transition plan is referred to as the "step-down plan."  [A.R. at 18.]

The parents apparently agreed to the plan due to serious concerns with the services at Damar, such as A.M.'s lack of supervision, lack of communication devices, and inappropriately administered vaccinations.  [A.R. at 18.]  A.M. remained at Damar until April 2010, at which point A.M. returned home for a few days.  [A.R. at 19.]  A.M. returned to Damar April 13 to 16, and then permanently returned home.  [*Id.*]  The IHO found that A.M. stopped receiving educational services on April 16.  [*Id.*]  On April 17, 2010, the parents attempted to obtain transportation for A.M. from their home to Damar, but were informed by Steve Scofield, a school psychologist, that the cost of transportation was too high.  [A.R. at 19.]  IHO found that nothing further was done to address transportation issues and a CCC did not immediately convene.  [*Id.*]  At this time, the IHO also found that steps 2, 4, 5, 6, and 7 of the step-down plan had not been accomplished.  [*Id.*]

A CCC convened in May and a new IEP was formed to address A.M.'s transition from home to school.  [A.R. at 19–21.]  Despite the new IEP, Peterson was not made available during the summer and other services in the IEP were not provided in their entirety.  [A.R. at 21.]  The parents toured the school on August 12 and A.M. began school on August 17.  [A.R. at 22.]  Behavioral issues continued once school began and the school and parents attempted to address A.M.'s needs.  [*Id.*]  It was not until September 15, 2010, however, that an instructional assistant was made available to A.M.  [A.R. at 16.]

On September 16, the parents were called to come get A.M. from school.  [A.R. at 24.]

Scofield told the parents that A.M.'s placement at the school was not going to work. [*Id.*] A.M. never returned to school and the IHO found that there is no evidence that the school called the parents to inquire why A.M. never returned. [*Id.*] The IHO also found that there was no testimony that the school needed more time to make the placement work. [*Id.*]

On September 29, a CCC convened and A.M. was placed on homebound, "despite no[t] one of the CCC participants who testified supporting homebound as a placement including the parents." [A.R. at 24.] The parents did not sign the IEP for September 29 and continued to express concerns that the homebound placement would not work. [A.R. at 25.] Months passed with the parents declining services and the October 22 date for the triennial reevaluation passed without the school noticing. [*Id.*] In November 2010, the parents sent an email to the school stating that homebound was not working and that they "feel Joint Services has had more than ample time to to [sic] prepare and secure the appropriate education for [A.M.] since March . . . Joint Services either steps up or finds the right program outside of their district."[2] [A.R. at 26.]

On December 1, 2010, Defendants filed a complaint with the Department of Education alleging that A.M. had not received educational services since March 2010. [Docket No. 63 at 15.] On December 13, 2010, the parents sent an email to the school requesting "an emergency IEP ASAP!" [A.R. at 26.] A CCC did not convene until January 4 and 26. [A.R. at 26.] During the January conferences, the committee determined that a restricted classroom setting at the school would be appropriate and A.M. would return on February 3, 2011. [A.R. at 27.] Despite emails from the parents in November and December 2011 requesting residential placement at

---

[2]Joint Services refers to Hancock Madison Shelby Educational Services, which consists of six member schools that share special education services. [Docket No. 66 at 6.]

Damar, residential placement at Damar was not discussed during the January CCCs. [A.R. at 26, 872.] While the CCC notes apparently reflect that the parents gave verbal permission for a school placement, the parents ultimately did not sign the IEP. [A.R. at 27.] Testimony before the IHO also reflects that the parents did not approve of the January IEP. [*Id.*] The parents filed a request for a due process hearing which the Indiana Department of Education received on January 28, 2011, and A.M. did not return to school on February 3, 2011. [A.R. at 9, 19.]

The due process hearing was held over the course of four days in March 2011. [Docket No. 62 at 16.] On April 15, 2011, the IHO ruled in favor of Defendants and ordered A.M. to be placed at Heartspring, a private residential facility in Wichita, Kansas. [*Id.*] On May 11, 2011, Plaintiffs appealed the IHO's decision to this Court. [Docket No. 1.] Defendants moved for a preliminary injunction and it was granted. [Docket No. 9, 29.] Plaintiffs were ordered to abide by the IHO's order and place A.M. at Heartspring pending the appeal process. [Docket No. 29.] On October 14, 2011, the parties filed cross motions for summary judgment. [Docket Nos. 62, 65.]

## III.    Discussion

IDEA requires participating states to provide disabled students with a "free appropriate public education." *Jamie S. v. Milwaukee Public Schs.*, 668 F.3d 481, 486 (7th Cir. 2012) (citing 20 U.S.C. § 1412(a)(1)(A)). Once a disabled child is identified, "the local school district must evaluate the child's specific needs and develop an 'individualized educational program,' or 'IEP,' outlining the particular special-education services that are necessary to allow the child to learn in the 'least restrictive environment.'" *Jamie S.*, 668 F.3d at 486 (citing 20 U.S.C. §§ 1412(a)(4)–(5), 1414). The IEP is developed through a case conference process with the

parents' or guardians' input. *J.D. v. Crown Point Sch. Corp.*, No. 2:10-CV-508-TLS, 2012 WL 639922, at *10 (N.D. Ind. Feb. 24, 2012) (citing 20 U.S.C. §§ 1401(14), 1414(d)). "For an education to be 'appropriate' under the IDEA, the program set forth in the IEP (1) must be developed in compliance with the procedural safeguards set forth in the IDEA and (2) in its substance must be 'reasonably calculated to enable the child to receive educational benefits.'" *Stanley C. v. M.S.D. of Sw. Allen Cnty. Schs.*, 628 F. Supp. 2d 902, 921 (N.D. Ind. 2008) (citing *Bd. of Educ. of Hendrick Cent. Sch. Dist., Westchester Cnty. v. Rowley*, 458 U.S. 176, 206–07 (1982)).

Under the procedural prong, procedural violations alone do not necessarily amount to a denial of FAPE. The procedural violation must result in a loss of educational opportunity. *Hjortness ex rel. Hjortness v. Neenah Joint Sch. Dist.*, 507 F.3d 1060, 1065 (7th Cir. 2007). "The reenacted IDEA clarifies that, for procedural violations, an IHO may find that a child did not receive a FAPE only if the procedural inadequacies '(I) impeded the child's right to a free appropriate public education; (II) significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of a free appropriate public education to the parents' child; or (III) caused a deprivation of educational benefits.'" *Stanley*, 628 F. Supp. 2d at 920 (citing 20 U.S.C. § 1415(f)(3)(E)(ii)).

Under the substantive prong, FAPE does not mean that the best possible education must be provided, but requires that the student's IEP be "reasonably calculated to enable the child to receive an educational benefit." *M.B. ex rel. Berns v. Hamilton Se. Schs.*, 668 F.3d 851, 860 (7th Cir. 2011). In other words, an IEP passes muster when it is "likely to produce progress, not regression or trivial educational advancement." *Alex R. v. Forrestville Valley Cmty. Unit Sch.*

*Dist. No. 221*, 375 F.3d 603, 615 (7th Cir. 2004).  Reasonableness varies depending on the student, and "while one might demand only minimal results in the case of the most severely handicapped children, such results would be insufficient in the case of other children." *Id.* "Whether an IEP was 'reasonably calculated to enable the child to receive educational benefits' is a question of fact that . . . [courts] review for clear error." *Id.*

Additionally, the party challenging the outcome of the administrative proceedings bears the burden of proof.  *Alex R.*, 375 F.3d at 611.  "When reviewing a motion for summary judgment under the IDEA, which is the procedural vehicle for asking a court to decide the case based on the administrative record, the Court does not apply the traditional summary judgment standard, yet the statutory directive to rule based on the 'preponderance of the evidence' also removes the Court from the usual familiar territory of judicial review of administrative decisions."  *Stanley*, 628 F. Supp. 2d at 920 (citing *Evanston Cmty. Consol. Sch. Dist. No. 65 v. Michael M.*, 356 F.3d 798, 802 (7th Cir. 2004); *Todd v. Duneland Sch. Corp.*, 299 F.3d 899, 904 (7th Cir. 2002)).  "The district court must confer due weight to the final decisions of the state administrators and cannot substitute its own notions of sound educational policy for those of the school authorities."  *Butler v. Evans*, 225 F.3d 887, 892 (7th Cir. 2000).

A.      **Procedural violations**

1.      *Evaluations*

Plaintiffs challenge the IHO's finding that they failed to evaluate and reevaluate A.M. as mandated by IDEA.  Specifically, Plaintiffs claim that the "law allows either party to request an evaluation and also allows parties to agree that an evaluation is not necessary."  [Docket No. 72 at 8.]  Plaintiffs, however, are only partially correct.  While the parties may agree that an

evaluation or reevaluation is not necessary, absent parental agreement the school must evaluate

and reevaluate a student even when no request has been made.  34 C.F.R. § 300.303(b)(2)

provides:

> A reevaluation conducted under paragraph (a) of this section
> (1) May occur not more than once a year, unless the parent and the public agency agree
> otherwise; and
> (2) Must occur at least once every 3 years, unless the parent and the public agency agree that
> a reevaluation is unnecessary.

Similarly, 511 I.A.C. § 7-40-8 provides:

> (a) Once a student is eligible for special education and related services, any subsequent
> evaluation of the student is reevaluation, even if the student is being evaluated because a
> different or additional eligibility category is suspected.
> (b) A public agency must consider reevaluation for each student receiving special education
> and related services:
>> (1) at least once every three (3) years; however, reevaluation need not occur if the
>> parent and the public agency agree that it is unnecessary;
>> (2) if the public agency determines, at any time during the three (3) year cycle, that
>> additional information is needed to address the special education or related services
>> needs of the student; and
>> (3) if the student's parent or teacher requests reevaluation.

The IHO concluded that procedural violations occurred because Plaintiffs "failed to initially

evaluate the Student and failed to reevaluate him in fall 2010 as well . . . ."  [A.R. at 38–39.]

Plaintiffs' attempt to evaluate A.M. in 1999 was unsuccessful and although the parents waived

the 2007 reevaluation, the triennial reevaluation date set by the 2007 waiver would have been

October 22, 2010, which did not occur.  [A.R. at 25, 37.]  Simply holding meetings and

conversations about A.M.'s special needs [Docket No. 72 at 9–10] does not amount to a waiver

or somehow absolve Plaintiffs from conducting the mandatory reevaluation.  Plaintiffs cite an

audio-recording of an August 23, 2010, CCC in support of their position that the parents agreed

to other waivers.  [Docket No. 72 at 10.]  The recording, however, is nearly an hour long and

Plaintiffs fail to provide any pinpoint citation or otherwise direct the Court to what part of the recording they believe resulted in a waiver of any evaluations or reevaluations. [*See* Docket No. 72 at 10, 14.] The Court need not scour the recording to make Plaintiffs' case. *See Harvey v. Town of Merrillville*, 649 F.3d 526, 529 (7th Cir. 2011). In any event, the review of the recording the Court did conduct does not reveal an agreement to waive any evaluations or reevaluations.

Additionally, the statutory scheme referenced by Plaintiffs does not require the parents to request a hearing. 34 C.F.R. § 300.303(b)(2) says nothing about parents requesting a hearing. Moreover, while 511 I.A.C. § 7-40-8(b)(3) provides that parents or teachers can request a reevaluation, this provision cannot reasonably be read to relieve Plaintiffs of their three-year obligation. The right to a mandatory three-year reevaluation under 511 I.A.C. § 7-40-8(b)(1) and a parental request for a reevaluation under 511 I.A.C. § 7-40-8(b)(3) are distinct rights. If 511 I.A.C. § 7-40-8(b)(1) and 511 I.A.C. § 7-40-8(b)(3) were meant to be read as one provision, it would be unnecessary for the parents to agree that the three-year reevaluation was unnecessary; the parents could simply not make a request. Such an interpretation is consistent with IDEA, which requires that local educational agencies reevaluate each child with a disability every three years regardless of a parental request. *See* 20 U.S.C. § 1414(2)(A). Provision 511 I.A.C. § 7-40-8(b)(3) simply enables parents to request evaluations between the mandatory three-year reevaluation periods. Accordingly, the Magistrate Judge finds that the IHO did not misapply the law by finding that the school was required to conduct a timely initial evaluation and revaluation.

A procedural violation, however, must result in a loss of educational opportunity for a denial of FAPE. *Hjortness*, 507 F.3d at 1065. Without an initial evaluation and revaluations,

A.M.'s right to appropriate education was impeded. While the IHO did not make this explicit finding, it defies logic to conclude that appropriate decisions could be made without the initial evaluation and reevaluations that Congress found important enough to mandate under IDEA. Congress included the evaluation and reevaluation requirements in IDEA because they are essential to implementing an individually designed IEP that is reasonably calculated to provide educational benefits. *See Rowley*, 458 U.S. at 202 ("One child may have little difficulty competing successfully in an academic setting with nonhandicapped children while another child may encounter great difficulty in acquiring even the most basic of self-maintenance skills."); *N.B. v. Hellgate Elementary Sch. Dist.*, 541 F.3d 1202, 1210 (9th Cir. 2008) (failing to conduct required evaluations is a procedural violation that prevents schools from developing an IEP reasonably calculated to provide a meaningful educational benefit); *Flowers v. Martinez Unified Sch. Dist.*, 19 IDELR 898 (N.D. Cal. 1998) ("Without an appropriate diagnosis of [the student's] special needs, there could be no formulation of an IEP that would address those special needs."). Because the school did not perform an initial evaluation or the 2010 reevaluation, the Magistrate Judge finds that the procedural violations resulted in a denial of FAPE.

2.    *February, May, and August/September 2010 IEPs*

The Court next considers whether Plaintiffs failed to implement the February, May, and August/September 2010 IEPs and, if so, whether the lack of implementation resulted in the denial of FAPE. Some of the services contained in the February, May, and August/September 2010 IEPs that were not provided or implemented include:

- Step-down plan steps 2, 3, 5, 6, and 7 had not been implemented;
- A.M. was not presented to the Child Services Planning Committee;
- Autism waiver service providers were not invited to the IEP meetings;
- School staff did not visit Damar to learn A.M.'s routine;

- No occupational or speech therapy was provided after leaving Damar;
- No 1:1 instructional assistant was provided during the summer;
- A.M. never attended school for more than an hour despite a plan to increase his time at school over the course of the summer to a full day;
- No 1:1 instructional assistant was available when A.M. began school in August 2010;

[A.R. at 19–20; Docket No. 63 at 23–25.]  The IHO also lists several other services that were not provided between winter 2010 and winter 2011.  [*See* A.R. at 34.]

Plaintiffs do not dispute that they failed to provide essential services in these IEPs or that such a failure resulted in a denial of FAPE.  Rather, Plaintiffs only argue that these IEPs were reasonably calculated to provide meaningful educational benefits.  [Docket No. 72 at 11; Docket No. 66 at 22.]  IDEA, however, imposes both procedural and substantive obligations on Plaintiffs.  *Hjortness*, 507 F.3d at 1065.  It is unclear why Plaintiffs argue that the February, May, and August IEPs were reasonably calculated to provide a FAPE.  [Docket No. 72 at 11–12.]  The IHO never concluded that they were not reasonably calculated to provide a FAPE [A.R. at 35], and only found that they were not implemented.  [A.R. at 34, 37.]  Plaintiffs apparently have ignored or chosen not to address the procedural aspect of implementing IEPs.

Nevertheless, these procedural violations resulted in a denial of a FAPE.  IEPs are tailored to the unique needs of disabled students and are the plan for providing a FAPE.  *See Rowley*, 458 U.S. at 181–82.  When a school fails to implement essential services contained in an IEP, the denial of services impedes the student's ability to receive a FAPE.  Plaintiffs do not dispute the IHO's findings or Defendants' claim that this procedural violation resulted in a FAPE.  At best, Plaintiffs' briefs can be read to imply that some of the February IEP services were not provided due to the parent's early removal of A.M. from Damar.  The IHO, however, found that steps 2, 4, 5, 6, and 7 could have been completed prior to the removal of A.M. from

Damar and no attempt was ever made to complete steps 4 through 6. [A.R. at 20.] Moreover, when the parents discussed the possibility of a transition home due to problems at Damar, Scofield did not object. [Docket No. 63 at 24.] Rather, he encouraged the transition home as he felt it would better facilitate the transition back to school. [*Id.*] Accordingly, the Magistrate Judge finds that Plaintiffs have not met their burden on summary judgment and the IHO's decision should not be disturbed.

### B. Substantive violations

*1. September 29, 2010, IEP*

The parties also disagree about whether the September 29, 2010, IEP was reasonably calculated to provide meaningful educational benefits. The primary source of contention in the IEP is A.M.'s homebound placement. Despite Plaintiffs' claim that homebound was a sufficient placement, homebound was not reasonably calculated to provide meaningful educational benefits because A.M. could not accomplish the goals listed in the IEP. The goals set forth in the IEP could not be accomplished in a homebound setting for two reasons: (1) the goals were specifically designed for a school or residential setting, and (2) A.M.'s behavioral problems interfered with his ability to learn and accomplish the IEP's goals outside of a residential setting.

There are several examples of goals that were specifically designed for a school or residential environment that could not be accomplished in a homebound setting. For example, one goal was for A.M. to keep his hands to himself in groups of two or more in a school setting. [A.R. at 829–31.] Obviously, in a homebound setting A.M. was not in a school setting with a group of two or more. Also, in a homebound setting, there are not more than three tables for A.M. to wipe, A.M. cannot collect trash and take it to a dumpster, and cannot learn to go through

a cafeteria line. [*Id.*] Moreover, Trace Benedict, assistant director of Joint Services, and Liz Farmer, the autism coordinator, testified that several goals in the IEP were not appropriate for homebound placement. [Docket No. 72 at 15.] This evidence was unrebutted by the school at the hearing, and no witnesses testified that homebound was an appropriate placement. [*Id.* at 29–31.] In fact, the IHO found that the goals in the IEP were "cloned over from the school-based program, and many were not appropriate to a homebound setting." [A.R. at 25.]

According to the IHO, another problem with homebound placement was that A.M. could not learn to function as part of a community, live with others, or obtain daily living skills without addressing his behavioral problems in a 24 hour a day, 7 day a week, placement. [A.R. at 35–36.] Plaintiffs do not address the goals designed for a school or residential setting, but instead focus on goals that could not be accomplished due to A.M.'s behavioral problems. Specifically, Plaintiffs argue that the IHO erroneously "made the School responsible for the certain behavioral issues occurring in the home setting." [Docket No. 66 at 25.] This argument mischaracterizes the IHO's findings. The IHO did not find that the September IEP needed to set forth a program that addressed A.M.'s behavioral problems at home, but found that his behavioral problems prevented him from accomplishing his goals at home and therefore he required residential placement. In any event, the cases that Plaintiffs cite to support their argument that the IEP did not need to address A.M.'s behavior at home are inapplicable because those cases only deal with students in a school setting as opposed to homebound placement. *See Thompson R2-J Sch. Dist. v. Luke P. ex rel. Jeff P.*, 540 F.3d 1143, 1150 (10th Cir. 2008); *L.G. ex rel. B.G. v. Sch. Bd. of Palm Beach Cnty.*, 255 F. App'x 360, 365–67 (11th Cir. 2007); *Gonzalez v. P.R. Dept. of Educ.*, 254 F.3d 350, 353 (1st Cir. 2001); *Doe v. Hampden-Wilbraham*

*Reg'l Sch. Dist.*, 715 F. Supp. 2d 185 (Dist. Mass. 2010).  In summary, several essential goals set forth in the September 29, 2010, IEP could not be accomplished in a homebound setting, and due to A.M.'s behavioral problems he should have been placed in a residential facility.  The Magistrate Judge therefore finds that the record sufficiently supports the IHO's finding that homebound placement was not reasonably calculated to provide meaningful educational benefits.

2.     *January 2011 IEP*

Plaintiffs raise several arguments in response to the IHO's conclusion that the January 2011 IEP was not reasonably calculated to provide meaningful educational benefits.  The January 2011 CCCs were convened in response to the parents' repeated concerns that homebound placement was not working.  In response to the parents' concerns, the proposed January IEP called for A.M. to return to school in February 2011.  The parties dispute whether returning to school or a residential placement was appropriate for A.M.  Plaintiffs also contend that because the parents failed to collaborate with the school and failed to wait for a final IEP to be formulated before requesting a due process hearing, the parents should be prevented from asserting that the IEP was not reasonably calculated to provide meaningful educational benefits. [Docket No. 72 at 16; Docket No. 66 at 28.]

Despite the January IEP tailoring services and goals to many of A.M.'s individualized needs, the IEP was not reasonably calculated to confer education benefits because A.M. required residential placement.  A residential placement is required when it is a "necessary predicate for learning" as opposed to a "response to medical, social or emotional problems that are segregable from the learning process."  *Dale M. ex rel. Alice M. v. Bd. of Educ. of Bradley-Bourbonnais High Sch. Dist. No. 307*, 237 F.3d 813, 817–18 (7th Cir. 2001).  The IHO found that:

> [A]ny placement that will be appropriate for Student will be 24 hours a day, 7 days a week and will be focused on teaching Student skills of daily living, so that he may one day get along in supported employment, be a functioning part of his community and able to live with others, all of which are possible outcomes of the appropriate placement. Without a 24/7 placement, there is little hope that Student will acquire these skills, especially in terms of replacing his inappropriate sexual behaviors with appropriate behaviors.

[A.R. at 35.]  Defendants also point out:

> [I]t is surprising that Plaintiff[s] have taken the position that residential is not the appropriate placement for A.M., especially in light of the fact that each and every post secondary transition goal in any of A.M.'s IEP[s] indicates that it is a goal that A.M. will live in a residential placement or group home. Moreover, when the school was exploring Medicaid options for A.M., most of these were residential options. AR 1872 . . . Farmer's testimony alluded to the appropriateness of residential programming for A.M. AR 2858, Lines 4–5.

[Docket No. 63 at 31.]  Furthermore, Dr. Brouillard testified that "A.M.'s needs are so intense the he continued to need residential placement."  [A.R. at 3273–74.]  Dr. Brouillard testified that he did not just look at A.M.'s behavioral problems in isolation when determining that residential placement is appropriate but considered "the whole package, where are his learning skills, where are his needs, how independent or not independent is the child, communication skills, sensory needs, every aspect of that child in terms of what does this child need in order to learn and to learn how to function."  [*Id.*]  Accordingly, the Magistrate Judge finds that there is ample evidence in the record to support the IHO's finding that a residential placement is necessary to provide educational benefits.

Nevertheless, Plaintiffs attempt to shift responsibility of the failed IEP process to the parents.  Plaintiffs cite *Berns v. Hamilton Southeastern Schools*, No. 1:09-CV-0304-TWP-TAB, 2010 WL 3168666 (S.D. Ind. Aug. 10, 2010), in support of their position that a parent who fails to collaborate cannot turn around and challenge an IEP.  [Docket No. 66 at 26.]  In *Berns*, the parents agreed with the goals and service plan developed by the CCC from the initial conference

and had "no quarrel with the level of services that the school was providing . . . ." 2010 WL 3168666, at *6. The parents also did not elect to participate in any further case conferences after the initial conference. *Id.* The Court found it "inequitable to allow the parents, who cut off all participation in the CCC at a point in time when there was no disagreement on current services, to recover compensatory damages for a failure to provide FAPE during a time period for which they had participated in approving the progress goals and the IEP to be followed." *Id.*

Plaintiffs also cite *Hjortness ex rel. Hjortness*, 507 F.3d 1060, 1066 (7th Cir. 2007), in which the parents chose not to actively and meaningfully participate in the discussions at the IEP meetings. Instead, they "refused to talk about anything other than 'whether the school district would pay for Joel to be at Sonia Shankman where he needs to be.'" *Id.* Consequently, the school was "left with no choice but to devise a plan without the meaningful input of Joel's parents." *Id.* "Thus, the school district did not need to consider private placement once it determined that public placement was appropriate." *Id.*

Unlike *Burns* and *Hjortness*, A.M.'s parents participated in all of A.M.'s CCCs, including those held in January 2011. In fact, A.M.'s parents took the initiative in November and December to request a CCC so that A.M. could be placed back at Damar. [A.R. at 26.] A CCC did not convene until January 4 and 26. While the January 4 CCC notes reflect a discussion about three residential services, the CCC never discussed placement at Damar despite the parents' specific request. [A.R. at 871–72.] On January 10, the parents sent an email "to Benedict, Scofield, and Michael Bennett, Director of Joint Services, [which] said why meet again, 'When the subject of DAMAR SERVICES is brought up you avoid placement discussion. As you well know, public school is not appropriate placement for [Student]. His immediate

placement is critical!'" [A.R. at 26–27.] By the time a CCC reconvened on January 26, Plaintiffs had received the results of the DOE's investigation, which concluded that the school had not been providing adequate services. [Docket No. 63 at 32.] Despite the DOE's conclusion and the frustration reflected in the January 10 email, the parents still attended the January 26 CCC and A.M.'s parents—unlike the parents in *Hjortness*—attempted to devise a plan with the school. [*See* Docket No. 66 at 28 ("The Parents requested a CCC and then, rather than actively refusing to collaborate, appeared to agree with the School on objectives and goals . . . .").] Although the parents attempted to collaborate with Plaintiffs, which Plaintiffs incorrectly construe as an agreement, the parents did not sign the January IEP, thereby reflecting their disapproval. [A.R. at 27.] Thus, unlike *Burns* and *Hjortness*, the parents actively participated in the formation of the IEP despite the school's failure to fully address the parents' concerns.

Plaintiffs also claim that the parents interfered with the collaborative process because they obtained a private evaluation and did not disclose the evaluation or the results to the school. [Docket No. 66 at 26.] Plaintiffs, however, do not cite any authority that prohibits parents from seeking a private evaluation or penalizes them for failing to disclose results. On the contrary, Plaintiffs did not provide a timely initial evaluation and did not conduct the October 2010 reevaluation. It would be inequitable to allow the school to claim that the parents were not providing sufficient input when Plaintiffs themselves also were not providing necessary information to the parents, namely results from mandatory evaluations that were never conducted. *See N.B. v. Hellgate Elementary Sch. Dist.*, 541 F.3d 1202, 1210 (9th Cir. 2008) (failing to conduct required evaluations prevents schools from developing an IEP reasonably calculated to provide a meaningful educational benefit).

Plaintiffs further argue that the January IEP was not finalized before the parents requested a due process hearing and therefore did not give the school a chance to address the parents' concerns. [Docket No. 72 at 20.] Plaintiffs cite *C.G. v. Five Town Community School District*, 513 F.3d 279 (1st Cir. 2008), in support of their position. [Docket No. 72 at 20.] *Five Town* discusses how to assess the validity of an IEP when a due process request has been made before a final IEP is formulated. The following discussion provides some guidance:

> To determine whether an IEP provides the requisite educational benefit in a given case, some courts will in some circumstances consider only the final version of the IEP that the school system offered during the IEP process. The thinking behind this so-called "four corners" rule is that when the IEP process has run its course and the school system has made its last, best offer of an IEP, a reviewing court faced with a substantive challenge will have a clear record of what placements and educational services were offered. . . .
>
> If there is no last, best offer—that is, if the parents have initiated the adversary process in advance of the development of a final IEP—it makes very little sense to consider only the latest version of the IEP. This is especially true where the school system has acted expeditiously and the development of a final IEP has been frustrated by the parents' refusal to cooperate fully in the collaborative process. In such circumstances, it would be wrong to put blinders on a reviewing court and restrict its inquiry to the partially completed IEP.
>
> When this sort of scenario arises, the court should proceed to consider issues such as the way in which the IEP process unfolded and the relative responsibility of the participants for the breakdown of the process. In exploring such issues, the court is entitled to look at the totality of the circumstances, consider extrinsic evidence if necessary, and judge the parents' claims accordingly.

*Five Town*, 513 F.3d at 285–86 (internal citations omitted).

As discussed above, *Five Town* does not prohibit parents from filing a due process request before an IEP is finalized; it merely discusses how to determine the validity of a partially created IEP. As noted, the parents did not refuse to cooperate fully in the collaborative process. On the contrary, the IHO's factual findings reflect that the parents repeatedly articulated their belief that residential placement was necessary, yet the school failed to consider residential placement at Damar during the January CCCs. [A.R. at 26.] In this case, it makes little sense to

wait for a finalized IEP fancifully hoping that the school would change its position and provide residential placement. The school had several opportunities to consider placement at Damar prior to the due process request but did not consider the option. While Plaintiffs assert that the parents appeared to be in agreement with the school because they did not specifically voice an objection at the CCCs, any lack of objection at the CCCs appears to be nothing more than a complete breakdown in the IEP process. The parents' objections, nonetheless, had previously been voiced to the school in the DOE complaint and numerous emails, including the January 10 email sent between the January CCCs. Considering the manner in which the IEP process unfolded, the Magistrate Judge finds that the parents sufficiently collaborated with the school under the circumstances, Defendants' request for a due process hearing was appropriate, and there is sufficient evidence in the record to support the IHO's finding that the January 2011 IEP was not reasonably calculated to provide meaningful educational benefits.

### C. Relief granted by the IHO

#### 1. Heartspring

Plaintiffs further argue that even if the IEPs were deficient, "Parents presented virtually no evidence to the IHO concerning whether placement at Heartspring would be appropriate for A.M.'s particular needs." [Docket No. 66 at 30.] While the Magistrate Judge agrees that the IHO could have made more specific findings about Heartspring and tailored her findings specifically to A.M., the IHO's findings are sufficient.

The IHO made numerous findings about Heartspring and concluded that the "Petitioners have showed that the placement proposed by them is appropriate." [A.R. at 22–23, 32.] The IHO found that A.M. needs residential placement. [A.R. at 37–39.] Heartspring is a residential

and educational placement where 90% of the students fall within the autism spectrum and 95% of Heartspring's placements are students.  [A.R. at 29.]  Heartspring also strives for 100% consistency for the student 24/7 [*id.*], which is the exact type of placement that the IHO specifically found A.M. needs.  [A.R. at 32, 35, 39.]  The IHO also considered that Dr. Brouillard specifically recommended Heartspring for A.M.  [A.R. at 29.]  Moreover, Heatspring uses the TEACCH methodology, which is the methodology that Dr. Brouillard and Steck, a school psychologist, recommended for A.M.  [Docket No. 63 at 35.]  Furthermore, Cara Rapp, a Heartspring representative, testified that Heartspring uses a highly structured program, which was also recommended by Dr. Brouillard, Steck, and Benedict.  [*Id.* at 36.]  Finally, many of the IEPs proposed by the school set the goal that A.M. will live in a residential setting, and Heartspring will also be able to provide services that were recommended in the IEPs that the school ignored or could not provide in the past.  [*Id.*]  Accordingly, the IHO's placement of A.M. at Heartspring is consistent with A.M.'s individualized needs and should not be disturbed.[3]

### 2.    *Compensatory education*

Plaintiffs also argue that an award of two years of compensatory education is an abuse of discretion.  [Docket No. 66 at 31.]  Relief in the form of compensatory education is an exceptional remedy and it is not expressly authorized by the statute.  *Brown v. Bartholomew Consol. Sch. Corp.*, 422 F.3d 588, 597 (7th Cir. 2006).  IDEA, however, authorizes courts to award aggrieved parties "such relief as the court determines is appropriate."  *Id.* (citing 20 U.S.C. § 1415(h)(2)(B)).  The Courts' authority to award relief encompasses a "range of

---

[3]Plaintiffs' second argument need not be addressed.  [Docket No. 66 at 31.]  As noted, the parents requested residential placement on several occasions.

equitable remedies and therefore empowers a court to order . . . compensatory education if necessary to cure a violation." *Brown*, 422 F.3d at 597–98.

Plaintiffs challenge the award with two seemingly inconsistent arguments. First, Plaintiffs argue that a compensatory award should not be awarded on a day-for-day basis. [Docket No. 66 at 32.] Second, Plaintiffs argue that the IHO abused her discretion by awarding "two years of compensatory education, fourteen months more than the time period from which her findings show the School failed to provide A.M. services."[4] [*Id.* at 34.] The Magistrate Judge agrees that the IHO is not required to make an award based on a rigid day-for-day formula. However, as a result, the IHO is permitted to award more time than which her findings show the school failed to provide so long as the award is "reasonably calculated to provide the educational benefits that likely would have accrued from special education services the school district should have supplied in the first place." *Reid ex rel. Reid v. District of Columbia*, 401 F.3d 516, 524 (D.C. Cir. 2005).

Only one circuit court has found that a "disabled child is entitled to compensatory education for a period equal to the period of deprivation, but excluding the time reasonably required for the school district to rectify to problem." *Petrina W. v. City of Chi. Pub. Sch. Dist. 299*, No. 08-CV-3183, 2009 WL 5066651, at *3 (N.D. Ill. Dec. 10, 2009) (citing *Mary T. Sch. Dist. of Phila.*, 575 F.3d 235, 248 (3d Cir. 2009)). "Other circuits, however, disapprove of rote, day-by-day formulas for determining compensatory education awards." *Petrina*, 2009 WL

---

[4]Plaintiffs calculation of time without services is inconsistent with the IHO's finding that services were denied beginning in winter 2010. As previously discussed, the IHO found that several of the steps in the step-down plan could have been implemented by April and Scofield did not object but encouraged the transition home. [A.R. at 20, 37; Docket No. 63 at 24.]

5066651, at *4 (citing *Draper v. Atl. Indep. Sch. Sys.*, 518 F.3d 1275, 1290 (11th Cir. 2008); *Bd. of Educ. of Fayette Cnty., Ky. v. L.M.*, 478 F.3d 307, 316 (6th Cir. 2007); *Reid*, 401 F.3d at 523; *Parents of Student W. v. Puyallup Sch. Dist. 3*, 31 F.3d 1489, 1497 (9th Cir. 1994)). While the Seventh Circuit has not decided this issue, district courts within the Seven Circuit have also disapproved of a rigid formula for calculating a compensatory award. *See T.G. ex rel. T.G. v. Midland Sch. Dist. 7*, ___ F. Supp. 2d ___, 2012 WL 264186, at *14 (C.D. Ill. Jan. 27, 2012); *Petrina*, 2009 WL 5066651, at *4.

The Magistrate Judge is not persuaded by the Third Circuit's approach. As the D.C. Circuit observed, because compensatory relief is an equitable remedy, a rigid formula for calculating relief is inappropriate. *Reid*, 401 F.3d at 523–24. An award of compensatory damages should be flexible and molded to the necessities of each particular case. *Id.* at 524. Some students may require "short, intensive compensatory programs targeted at specific problems," and other students may need "extended programs . . . exceeding hour-for-hour replacement of time spent without FAPE." *Id.*

The IDEA violations in this case are more than mere procedural technicalities. *See Evanston Cmty. Consol. Sch. Dist. No. 65 v. Michael M.*, 356 F.3d 798, 803 (7th Cir. 2004) (affirming an award of compensatory education when the IDEA violations were more than a mere procedural technicality). The IHO found that procedural and substantive violations denying A.M. a FAPE occurred between winter 2010 and winter 2011. [A.R. at 23–30.] Plaintiffs are correct that a compensatory award based on a rigid day-for-day formula should result in a compensatory award of approximately a year. However, as other courts have indicated, a rigid approach to awarding compensatory education is not usually adequate. Courts

must consider other factors necessary to "remedy . . . an educational deficit created by an educational agency's failure . . . to provide a FAPE to a student." *Reid*, 401 F.3d. at 523.

While Plaintiffs are correct that the IHO did not fully justify her award of compensatory education, the IHO's award was reasonable in light of her factual findings. *See Midland*, 2012 WL 264186, at *14 (explaining that district courts should defer to an IHO's order of compensatory damages "so long as it is reasonable and supported by evidence."). When services are denied to a student with severe autism for over a year, it is reasonable for the IHO to conclude that compensatory education beyond a year is needed, perhaps to compensate for the loss of services or to bring up to speed A.M.'s education, which may have regressed during the last year. *Id.* (explaining that awards for compensatory education should be "reasonably calculated to provide the educational benefits that likely would have accrued from special education services the school district should have supplied in the first place."). In fact, it appears that A.M.'s progress actually did regress to some extent during the period with no services. As Plaintiffs points out, A.M.'s behavior had improved while at Damar [Docket No. 66 at 32], but when Dr. Brouillard examined A.M. several months later, he observed that A.M. has very impaired daily living skills, no leisure time skill, limited social skills, and very aggressive outbursts. [A.R. at 29.] The IHO also carefully considered evidence concerning the extent of services that A.M. was deprived and the length of deprivation before ordering two years of compensatory education. [*See* A.R. at 19–29.] In light of the factual circumstances in this case, the Magistrate Judge finds that a two year compensatory award is reasonable and not an abuse of discretion.

### D.  New evidence

"[W]here the district court does not take new evidence and relies solely on the administrative record, it owes considerable deference to the hearing officer, and may set aside the administrative order only if it is 'strongly convinced that the order is erroneous.'" *Alex R.*, 375 F.3d at 612.  "The more that the district court relies on new evidence, however, the less it should defer to the administrative decision: '[j]udicial review is more searching the greater the amount (weighted by significance) of the evidence that the court has but the agency did not have.'"  *Id.*  "In such circumstances, although the administrative record is still part of the case and the district court therefore must not go so far as to conduct a trial *de novo*, . . . less weight is due the administrative record."  *Id.*  The Magistrate Judge, however, does not consider any new evidence, and therefore does not depart from the due deference standard.

Defendants offer three new pieces of evidence on summary judgment that were not presented to the IHO: a copy of a May 2011 IEP, a conference record dated August 5, 2011, and a June 2011 email regarding funding approval.  [Docket No. 63, Exs. A–C.]  Plaintiffs object to this new evidence, asserting that Defendants must offer a strong and particularized justification for why the evidence was not previously presented to the IHO.  [Docket No. 72 at 44–45.]  The Magistrate Judge has reviewed Defendants' exhibits and finds that the exhibits unnecessarily bolster the IHO's findings of fact and conclusions of law.  As such, the Magistrate Judge does not rely on these exhibits.

Plaintiffs also attempt to present new evidence, namely a recording of a September 29, 2010, CCC.  [Docket No. 66 at 21.]  During the administrative hearing, Plaintiffs' counsel inquired about a recording of a case conference that the parents claim they provided to

Defendants' counsel, but counsel did not recall receiving it. [A.R. at 3566–67.] Plaintiffs sought to admit the recording which was not present at the hearing and alternatively wanted time to conduct additional discovery. [A.R. at 3591–92.] The IHO denied Plaintiffs' motion because neither party had relied upon the recording during the administrative proceedings. [*Id.*]

Plaintiffs argue that the IHO abused her discretion because "the discussion in this meeting would obviously have shed some light on why the Parents had abandoned . . . the placement the parties previously agreed to in the May and August case conference meetings." [Docket No. 66 at 21.] Defendants assert that at the time of the hearing the recording did not exist and therefore could not have been admitted. [Docket No. 71 at 3.] Defendants' argument is well taken. It is impossible for the IHO to consider evidence that is not physically present at the hearing. Moreover, denying Plaintiffs' request to conduct additional discovery was not an abuse of discretion. While the existence of the recording was not revealed until the hearing, it is Plaintiffs' responsibility prior to the hearing to conduct discovery and take the necessary steps to identify evidence and ensure that it is available at the hearing. Finally, even if the IHO abused her discretion, Plaintiffs have not offered the recording to show that it is contrary to the IHO's conclusions and thus not harmless. *See Kim v. C.I.R.*, 679 F.3d 623, 627 (7th Cir. 2012) (explaining without an offer of proof, the court is unable to determine that the lower court abused its discretion by not admitting evidence). Accordingly, the Magistrate Judge finds that the IHO did not abuse her discretion by excluding the recording.

### E.     Sanctions

Defendants request sanctions against Plaintiffs pursuant to Federal Rule of Civil Procedure 11. [Docket No. 77.] Under Rule 11, "a court may impose sanctions on a party for

making arguments or filing claims that are frivolous, legally unreasonable, without factual foundation, or asserted for an improper purpose." *Fries v. Helsper*, 146 F.3d 452, 458 (7th Cir. 1998). "In particular, a frivolous argument or claim is one that is 'baseless and made without a reasonable and competent inquiry.'" *Id.* Sanctions, nonetheless, "are to be imposed sparingly, as they can have significant impact beyond the merits of the individual case and can affect the reputation and creativity of counsel." *Hartmarx Corp. v. Abboud*, 326 F.3d 862, 867 (7th Cir. 2003) (internal quotation marks omitted).

Defendants contend that Plaintiffs made frivolous claims, inaccurately represented case law to the Court, and made arguments not supported by evidence. [Docket No. 77.] A motion for Rule 11 sanctions, however, must be filed within a reasonable amount of time after the sanctionable conduct. Fed. R. Civ. P. 11(b)–(c) Advisory Committee's Note ("Ordinarily the motion should be served promptly after the inappropriate paper is filed, and if delayed too long, may be viewed as untimely."); *Sullivan v. Hunt*, 350 F.3d 664, 666 (7th Cir. 2003) ("Where appropriate, sanctions motions 'should be filed at an earlier time—as soon as practicable after discovery of a Rule 11 violation.'"). Defendants filed their Rule 11 motion on March 15, 2012 [Docket No. 76], nearly five months after Plaintiffs' filed their motion for summary judgment and over two months after it was fully briefed. [Docket Nos. 65, 74.] Defendants were aware of the alleged violation in November 2011 [Docket No. 77, Exs. A–C], but for some reason did not file their motion until March 2012. This delay renders Defendants' motion untimely. Additionally, while Plaintiffs could have more precisely and effectively discussed certain cases and arguments, overall Plaintiffs' advocacy is not the type that should result in sanctions. The Magistrate Judge therefore does not recommend sanctions under Rule 11.

**IV.     Conclusion**

For the reasons above, the Magistrate Judge recommends that Plaintiffs' motion for summary judgment [Docket No. 65] be denied, that Defendants' motion for summary judgment [Docket No. 62] be granted, and that Defendants' motion for sanctions [Docket No. 76] be denied.  Accordingly, the Magistrate Judge further recommends that the IHO's order be affirmed and Defendants be awarded two years of compensatory education and all other relief granted by the IHO.  Any objections to the Magistrate Judge's Report and Recommendation shall be filed with the Clerk in accordance with 28 U.S.C. § 636(b)(1).  Failure to file timely objections within fourteen days after service shall constitute waiver of subsequent review absent a showing of good cause for such failure.

Dated:   07/10/2012

Tim A. Baker
United States Magistrate Judge
Southern District of Indiana

Copies to:

Alexandra Marie Curlin
THE CURLIN LAW OFFICE
amcurlin@curlinlaw.com

Andrew Anthony Manna
CHURCH CHURCH HITTLE & ANTRIM
andrew@cchalaw.com

Catherine Marie Michael
HOLLINGSWORTH &  ZIVITZ, P.C.
CMichael@hzlegal.com

Alexander Phillip Pinegar
CHURCH CHURCH HITTLE & ANTRIM
apinegar@cchalaw.com